UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| **BODHI BUILDING, LTD.** <br> d/b/a "YOGASPA,"  <br><br> Plaintiff, <br><br> -against- <br><br> **ELMSFORD CHICKEN, LLC,** <br> d/b/a "POPEYE'S LOUISIANA KITCHEN," <br> **ELMSFORD PROPERTY, LLC, and URSTADT** <br> **BIDDLE PROPERTIES, INC.,** <br><br> Defendants. | Case No.: 1:21-CV-919 <br><br><br> **COMPLAINT** <br><br><br><br> **JURY TRIAL** <br> **DEMANDED** |

---

Plaintiff **BODHI BUILDING, LTD.**, by its attorneys **RICHTER RESTREPO PLLC**, as and for their Verified Complaint respectfully allege as follows:

### PRELIMINARY STATEMENT

1. This Complaint arises out of the wrongful actions of the Defendants in regard to the unauthorized and negligent construction undertaken by them and their agents. Defendants' actions caused significant damages to Plaintiff, a small business which was the first hot yoga studio to open in Westchester County over 20 years ago and which continued to operate successfully until Defendants' damages caused them to shut down indefinitely.

2. As set forth in detail below, Defendants' wrongful actions in managing, supervising and carrying out their construction work include trespass, negligence, intentional tortious damage, nuisance, fraud, breach of contract and constructive eviction, and have caused significant damage to Plaintiff's business.

1

## THE PARTIES

3. Plaintiff Bodhi Building, Ltd., d/b/a "YogaSpa" ("Plaintiff" or "YogaSpa") is, and was at all material times, a New York corporation organized and existing under the laws of the State of New York with its principal office located at 321 Tarrytown Road (a/k/a 321 E. Main Street), Elmsford, NY 10523.

4. Upon information and belief, Defendant Elmsford Chicken, LLC is, and was at all material times, a New York limited liability corporation, doing business as "Popeye's Louisiana Kitchen" ("Defendant" or "Popeyes") with a designated address for service at 100 Menlo Park Mall, Suite 500, Edison NJ 08837.

5. Upon information and belief, Defendant Elmsford Property, LLC ("Defendant" or "Elmsford") is, and was at all material times, a New York limited liability corporation with a designated address for service at 126 5th Ave., Room 600, New York, NY 10011.

6. Upon information and belief, Defendant Urstadt Biddle Properties, Inc. ("Defendant" or "Urstadt") is, and was at all material times, a Maryland business corporation with its principal office located at 321 Railroad Avenue, Greenwich, CT 06830.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as at least one Defendant is headquartered in a different state from Plaintiff, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

8. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

9. Elmsford is the owner of the commercial premises located at 321 Tarrytown Road, Elmsford, NY 10523 (the "Premises"). Urstadt is Elmsford's managing agent for the Premises. YogaSpa leases the Premises pursuant to a lease dated October 22, 2010 (the "Lease") which was amended by agreement dated March 16, 2016 (the "Lease Amendment") for a term expiring on March 31, 2021. The Lease and Lease Amendment are annexed hereto as **Exhibit "A"** and made a part hereof.

10. YogaSpa operates the Premises as a hot yoga studio, providing congregate and individual training in hot yoga as well as other therapeutic and wellness treatments. Until March 2020, it had successfully operated at the Premises for over twenty years.

11. The operation of this business requires specialized equipment and facilities to provide a sanitary environment, including specialized HVAC systems and air sanitization systems. With the consent of the prior landlord, YogaSpa installed all necessary equipment and facilities, at its own cost and expense, including an airtight closed cell spray foam insulated ceiling, specially insulated floor tiles, wall-to-wall mirrors, a custom HVAC system and ductwork, and a number of specialized heaters and pipes.

12. Most of this equipment was specifically concentrated in the Premises' studio, otherwise known as the "hot room", a 1,250 sq. foot room specifically designated for the purpose of meditation, concentration and focus for the duration of a 90-minute class in a room in which the temperature exceeds 105 degrees Fahrenheit.

13. On or about March 2, 2020, YogaSpa was advised by Urstadt that Popeyes had leased the premises located at 323 Tarrytown Road (a/k/a 323 E. Main Street), Elmsford, NY 10523 (the "Adjoining Premises") located in the same building as the Premises and immediately above it, and was carrying out construction on the Adjoining Premises.

14. On or about March 14, 2020, YogaSpa ceased all operations at the Premises due to an abundance of caution arising from the COVID-19 pandemic, and remained closed as a result of New York State Executive Order 202 subsequently thereafter.

15. On or about that time, the project manager overseeing Popeyes' construction, Mr. Jim Haid, requested access to the Premises for the purpose of creating plumbing access to a bathroom to be situated directly above the entrance to the Premises.

16. On the express understanding that this work would be limited only to the entrance to the Premises, and that no work would be carried out anywhere else in the Premises including but not limited to the hot room, YogaSpa provided Mr. Haid with a copy of the key to the Premises and allowed Popeyes to access the Premises for that specific purpose. YogaSpa received no further communication from Popeyes or any of its representatives regarding any further work.

17. Upon returning to the Premises on or about June 17, 2020, YogaSpa's President, Ms. Jacqueline Vernon, found that Popeye's work had not been limited to the purpose agreed to, and had both extended in scope beyond what was agreed and been carried out in an unworkmanlike manner such as to damage the Premises. This includes:

   a. Not less than 24 holes, some as large as ten-inch squares, were drilled in the airtight insulated ceiling, which holes were a) not sealed in an airtight manner and b) to the extent that they were sealed, were not done to workmanlike quality, leaving random protrusions of foam and epoxy of as much as twenty inches in length;

   b. A number of waste pipes and floor waste drains were left extending from a restaurant kitchen sewer as well as restroom toilets protruding some two feet from the ceiling. These waste pipes were defectively installed such that water, sewage

and other waste leaked and dripped into the hot room onto the specialized floor tiles and down the walls and mirrors in the room;

    c. The HVAC vents and ducts were not properly covered, allowing construction dust and debris to enter them and cause permanent damage to the customized HVAC system.

    d. Toxic black mold, which propagated within the wall and pipes due to the festering waste from the leakage, was allowed to enter the studio.

    e. Damage was done to equipment including televisions, heaters, mirrors, walls, floor mats and other equipment during the construction.

    f. Beyond the physical damage set forth above, the fact that the damage was not addressed at the time of the construction allowed it to persist in the intervening months, compounding the damage already done.

18. The extent of this damage rendered YogaSpa's business entirely inoperable. The function of the special equipment and facilities outlined herein is to create within the hot room an extremely specific environment, the temperature and humidity of which is highly regulated; without proper sanitation and regulation, this environment would allow mold and bacteria to propagate freely. The damage occasioned by Popeyes both compromised the airtightness and HVAC support to the hot room and introduced mold and sewage, presenting a safety risk to anyone using the studio.

19. On or about July 7, 2020, a representative of Urstadt, Mr. Jeremy Schwartz, visited the Premises alongside Ms. Vernon. Additionally, another Urstadt representative, Mr. Dinis Dias, who upon information and belief had supervised Popeye's construction work on behalf of Elmsford, took photographs of the damage.

20. By email dated July 22, 2020, Ms. Vernon detailed the damage to the Premises, and notified Elmsford formally that the damage to the studio would render it unusable for YogaSpa's business. Similar emails were repeatedly sent to Elmsford relaying pictures of the damage inflicted and requesting immediate action to remedy said damage.

21. In a subsequent conversation with Mr. Haid, he informed Ms. Vernon that Urstadt and Elmsford were aware that their original scope of work was to install the sewage pipes in the hot room, and that this information was conveyed to them prior to their commencement of work.

22. A full walkthrough of the Premises with representatives of all parties took place on or about September 24, 2020. On that date, Mr. Haid indicated, in front of representatives of Popeyes, Urstadt and Elmsford, that prior to commencing the work, he had informed Urstadt that the work was going to significantly impact YogaSpa's hot room, but that Urstadt told Mr. Haid to "go ahead with the work anyway."

23. Further, on September 24, 2020, YogaSpa, by correspondence addressed to Defendant Urstadt, demanded that they be compensated for the costs of i) the damaged equipment and improvements and ii) refunding YogaSpa members their outstanding membership fees.

24. On or about September 24, 2020, the above demand was rejected by Urstadt and Elmsford, who instead proposed to pay for an evaluation of the Premises to assess the cost of repairs. YogaSpa identified Cavalry Services ("Cavalry"), a firm specializing in Indoor Air Quality consulting with a view to building and consulting on hot yoga studios. Cavalry's report, annexed hereto as **Exhibit "B"**, notes that on November 3, 2020, their designer/project coordinator, Ms. Charisse Clark PhD, received a phone call from Mr. Dias regarding scheduling the assessment, on which Mr. Dias extemporized regarding Ms. Vernon's "unreasonable concerns", his view that "she

6

was just being a prima donna" and noted that he had not realized "how scientific and involved were the requirements of a hot yoga environment".

25. On or about November 10, 2020, Elmsford subsequently refused to schedule or pay Cavalry for the assessment that they requested. However, Cavalry visited the Premises on November 20, 2020 upon request by Ms. Vernon to assess the damages, upon upfront payment of $3,000.00 by YogaSpa, which was never reimbursed by the Defendants.

26. On November 23, 2020, prior Counsel for YogaSpa, Mr. Brian Hansbury notified YogaSpa of the result of negotiations with Elmsford, which were that: i) Popeyes had refused to acknowledge responsibility and was unwilling to contribute to resolving the matter; ii) Elmsford was only willing to pay for YogaSpa's damages if the parties negotiated an extension of the existing Lease, using the damage as leverage; and iii) Elmsford refused to pay for Cavalry's assessment of the Premises, and instead proposed having a mechanical engineer do the assessment to save on costs.

27. On November 24, 2020, Ms. Vernon spoke to Mr. Dias on the phone, during which call he acknowledged that Ms. Clark was "credible, fair, knowledgeable and capable" and reiterated his surprise about the level of scientific detail required to operate a hot yoga studio. Ms. Vernon also noted that she would not have granted permission to access the Premises had she known that Popeyes intended to work in the hot room, to which Mr. Dias responded that "it was just that the time frame matched up so well", and that it was convenient to allow Popeyes to complete all of their work while YogaSpa could not use the Premises anyway.

28. On December 17, 2020, Cavalry provided the parties with a copy of Ms. Clark's report. She found that remediation of the ceiling and replacing the damaged equipment would cost at least $185,000.00, and that doing so would still likely limit YogaSpa's business due to the

reduction in (i) overall square footage, (ii) ceiling height from eleven feet high to eight feet, and (iii) breathable space in the hot room.

29. By letter dated December 23, 2020, Counsel for Plaintiff wrote to Elmsford and Urstadt, outlining the damage to the Premises, and demanding payment of all damages incurred by YogaSpa in an amount not less than $400,000.00 for, *inter alia*, the cost of all labor and materials for replacing the specialized HVAC system, floor mats, walls, mirrors and the lowered hard top/gypsum ceiling, performing mold remediation, sanitization, soundproofing the hot room, lost revenue due to closure, utility fees, professional/expert fees and attorneys' fees.

30. A similar letter was sent to Popeye's counsel on December 29, 2020. A copy of these letters is annexed hereto as **Exhibit "C"** and made a part hereof.

31. To date, Defendants have failed to admit liability or to commit toward paying Plaintiff's damages and costs, as referenced above.

32. By its actions, Popeyes has allowed its employees or agents to commit fraud, create a nuisance on, and trespass into, the Premises, caused damage to YogaSpa's property, whether inflicted intentionally or occasioned negligently.

33. Further, Elmsford breached the terms of the Lease between the parties inasmuch as it committed fraud and caused, or suffered to be caused, a breach of the covenant of quiet enjoyment. Moreover, Elmsford and Urstadt aided and abetted, or suffered to be caused, Popeyes' nuisance on and trespass into the Premises and damage to YogaSpa's property and equipment inflicted intentionally or occasioned negligently, and perpetrated a fraud in misrepresenting the construction work and concealing the damages occasioned by same from YogaSpa.

## **AS AND FOR A FIRST CAUSE OF ACTION**
(*Trespass against Popeyes*)

34. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

35. YogaSpa was the tenant in lawful possession of the Premises at all material times herein.

36. While Popeyes' agents and/or employees had a license to enter the Premises, this license was expressly limited to the installation of pipes in the front entrance of the Premises, and not in the hot room nor any other location in the Premises.

37. Popeyes, its agents or employees, caused work to be carried out on the Premises which was knowingly outside of the scope of the license provided, inasmuch as they installed permanent fixtures in the hot room, an area which was outside of the express license granted.

38. Popeyes therefore unlawfully entered the hot room and invaded YogaSpa's right to exclusive possession of the Premises, which unlawful entry and invasion remained continuous and ongoing for several months.

39. Popeyes' invasion of YogaSpa's right to exclusive possession of the Premises was intentional, or was in reckless disregard of YogaSpa's rights and the license granted.

40. As a direct and proximate result of Popeyes' unlawful entry to the Premises and negligent installation of pipes and drains, YogaSpa suffered damages inasmuch as it suffered substantial damage to YogaSpa's trade fixtures and equipment, was effectively deprived of the use and enjoyment of the Premises for the commercial purpose for which it was leased, and has incurred damages through costs in refunding memberships and repairing equipment and fixtures, in an amount to be determined at trial, but not less than $400,000.00.

## AS AND FOR A SECOND CAUSE OF ACTION
### (*Negligence against Popeyes*)

41. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

42. By granting its license, Popeyes owed YogaSpa a duty to take reasonable care in the work performed in the Premises and to perform the work in a workmanlike manner within the standards of the construction industry in the County of Westchester.

43. Popeyes breached this duty of care by causing its employees or agents to install the pipes outside of the agreed-upon area, and in such a manner as to damage YogaSpa's trade fixtures and equipment, and deny them the use and enjoyment of the Premises.

44. Popeyes' breach of duty both proximately and actually caused YogaSpa to suffer damages, failing to perform the work in a workmanlike manner within the standards of the construction industry in the County of Westchester, resulting in substantial damage to YogaSpa's trade fixtures and equipment, effectively depriving YogaSpa of the use and enjoyment of the Premises for the commercial purpose for which it was leased, and incurring damages through costs in refunding memberships and repairing equipment and fixtures, in an amount to be determined at trial, but not less than $400,000.00.

45. In the alternative, YogaSpa pleads that the doctrine of *res ipsa locquitur* is applicable.

## AS AND FOR A THIRD CAUSE OF ACTION
### (*Intentional Tortious Damage to Property against Popeyes*)

46. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

47. Popeyes occasioned damage to the Premises as set forth above, consisting of substantial damage to its trade fixtures, was effectively deprived of the use and enjoyment of the

10

Premises for the commercial purpose for which it was leased, and has incurred costs in refunding memberships and repairing equipment and fixtures.

48. This damage was caused by the intention, malicious, reckless and/or wanton actions of Popeyes, its agents or employees.

49. As a direct and proximate result of Popeyes' intentional infliction of damage, YogaSpa suffered damages inasmuch as it suffered substantial damage to its trade fixtures and equipment, was effectively deprived of the use and enjoyment of the Premises for the commercial purpose for which it was leased, and has incurred damages through costs in refunding memberships and repairing equipment and fixtures, in an amount to be determined at trial, but not less than $400,000.00.

## AS AND FOR A FOURTH CAUSE OF ACTION
(*Private Nuisance against Popeyes*)

50. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

51. Popeyes, its agents or employees, caused work to be carried out on the Premises which was knowingly outside of the scope of the license provided, and for the sole purpose of enabling their use of the Adjoining Premises.

52. Popeyes' use of the Adjoining Premises, through the use of the pipes and drains installed in the Premises, constitutes a continuous interference in YogaSpa's rights to use and enjoy the Premises, inasmuch as it prevents YogaSpa from carrying out its business on the Premises.

53. Popeyes' interference is substantial in nature, inasmuch as it has occasioned harm to YogaSpa's trade fixtures which cannot be resolved without substantial repair work and at great cost, has compromised the safe and hygienic environment necessary for YogaSpa to carry on its business, and has therefore precluded YogaSpa from operating its business.

54. Popeyes' interference is intentional in origin inasmuch as Popeyes knowingly exceeded the scope of the license which they were granted and intentionally installed pipes and drains which were for the sole benefit of the Adjoining Premises.

55. Popeyes' interference is unreasonable in character inasmuch as it disproportionately affects YogaSpa by precluding it from carrying on the business for which it leases the Premises and occasioning significant damage to its trade fixtures and equipment.

56. Accordingly, Popeyes has created an actionable and ongoing nuisance on the Premises.

57. As a direct and proximate result of the nuisance created by Popeyes, YogaSpa has suffered damages inasmuch as it suffered substantial damage to YogaSpa's trade fixtures, was effectively deprived of the use and enjoyment of the Premises for the commercial purpose for which it was leased, and has incurred damages through costs in refunding memberships and repairing equipment and fixtures, in an amount to be determined at trial, but not less than $400,000.00.

### AS AND FOR A FIFTH CAUSE OF ACTION
(*Fraudulent Misrepresentation against Popeyes*)

58. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

59. Popeyes had knowledge of the scope of work it intended to carry out on the Premises and the Adjoining Premises, and the impact that this was likely to have on the Premises.

60. Popeyes, through its representative Mr. Haid, made an express representation that the work to be carried out would be limited to the entrance, and not to the hot room.

61. This representation was false when it was made, as Popeyes always intended to carry out work in the hot room, as indicated by their seeking permission to do so from Elmsford and Urstadt.

62. Popeyes, its agents and/or employees knowingly and intentionally made this false and misleading representation with the intention of inducing Plaintiff to give them permission to enter the Premises to carry out work, even though the actual scope of work was significantly beyond the scope of the permission granted.

63. Plaintiff justifiably relied on Popeyes' representation that the work to be carried out would be limited to the entrance.

64. As a direct and proximate result of this material misrepresentation, YogaSpa has suffered damages including substantial damage to its trade fixtures and equipment, was effectively deprived of the use and enjoyment of the Premises for the commercial purpose for which it was leased, and has incurred damages through costs in refunding memberships and repairing equipment and fixtures, in an amount to be determined at trial, but not less than $400,000.00

## AS AND FOR A SIXTH CAUSE OF ACTION
*(Fraudulent Concealment against Elmsford and Urstadt)*

65. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

66. Elmsford was at all material times hereto Plaintiff's landlord.

67. Elmsford, through its managing agent, Urstadt, had personal knowledge of Popeyes' trespass, the damage to the property occasioned thereby, and the nuisance caused thereby.

68. That Popeyes trespassed into the hot room without Plaintiff's permission and with the express encouragement of Urstadt's agents and/or employees is a material fact.

69. As Plaintiff's landlord, Elmsford had a duty to secure Plaintiff's permission before permitting entry to the hot room. As Elmsford's managing agent acting on its behalf, Urstadt also had a duty to secure Plaintiff's permission before permitting entry to the hot room.

70. Despite knowledge of Popeyes' trespass, the damage to the property occasioned thereby, and the nuisance caused thereby, Elmsford and Urstadt knowingly and intentionally concealed these facts from Plaintiff.

71. Elmsford and Urstadt's concealment of this material information not only allowed the trespass, and the damage occasioned thereby, to take place; it further aggravated those damages by, *inter alia*, allowing debris and particulate matter to settle in the HVAC system and on surfaces, waste to leak and pool, and mold to propagate and spread.

72. As a direct and proximate result of this fraudulent concealment, YogaSpa has suffered damages including substantial damage to its trade fixtures and equipment, was effectively deprived of the use and enjoyment of the Premises for the commercial purpose for which it was leased, and has incurred damages through costs in refunding memberships and repairing equipment and fixtures, in an amount to be determined at trial, but not less than $400,000.00.

## AS AND FOR A SEVENTH CAUSE OF ACTION
(*Civil Conspiracy against all Defendants*)

73. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

74. As set forth above, Popeyes, Elmsford and Urstadt, their respective agents and/or employees, each agreed to a common scheme where Popeyes would carry out work on the Premises and each would fraudulently conceal the nature and extent of this work from Plaintiff, as evidenced from Mr. Dias' assertion that the chief motivating factor in carrying out the work was not Plaintiff's permission to enter but the convenience of the timing of the work.

75. In furtherance of this common scheme, Popeyes, Elmsford and Urstadt, their respective agents and/or employees, overtly acted by making false and misleading statements or knowingly concealing the details of the work from Plaintiff.

76. The information that the Defendants concealed from Plaintiff was at all times relevant and material.

77. Popeyes, Elmsford and Urstadt fraudulently concealed the nature and scope of the work to be carried out from Plaintiff with the intention of inducing Plaintiff to give them permission to enter the Premises to carry out work, even though the actual scope of work was significantly beyond the scope of the permission granted.

78. Ms. Vernon materially and reasonably relied on this misrepresentation in granting a license to the Premises to Popeyes to perform the work.

79. As a direct and proximate result of Defendants' misrepresentations and omissions, YogaSpa has suffered damages including substantial damage to its trade fixtures and equipment, was effectively deprived of the use and enjoyment of the Premises for the commercial purpose for which it was leased, and has incurred damages through costs in refunding memberships and repairing equipment and fixtures, in an amount to be determined at trial, but not less than $400,000.00.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (*Aiding and Abetting Trespass against Elmsford and Urstadt*)

80. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

81. As set forth above, Popeyes trespassed on the Premises.

82. Elmsford and Urstadt were aware of the trespass, as indicated by the comments made by Mr. Dias to Ms. Vernon, occasioning damage to the Premises.

83. Elmsford and Urstadt knowingly and intentionally provided substantial assistance in furtherance of Popeyes' trespass by concealing the trespass from YogaSpa.

84. As a direct and proximate result of Elmsford and Urstadt's actions and/or inactions, YogaSpa has suffered damages including substantial damage to its trade fixtures and equipment,

was effectively deprived of the use and enjoyment of the Premises for the commercial purpose for which it was leased, and has incurred damages through costs in refunding memberships and repairing equipment and fixtures, in an amount to be determined at trial, but not less than $400,000.00.

### AS AND FOR A NINTH CAUSE OF ACTION
(*Aiding and Abetting Intentional Tortious Damage against Elmsford and Urstadt*)

85. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

86. As set forth above, Popeyes intentionally inflicted tortious damage to YogaSpa's trade fixtures.

87. Elmsford and Urstadt were aware of the intentional infliction of damage, as indicated by the comments made by Mr. Dias to Ms. Vernon.

88. Elmsford and Urstadt knowingly and intentionally provided substantial assistance in furtherance of Popeyes' intentional infliction of damage by concealing the damage from YogaSpa.

89. As a direct and proximate result of Elmsford and Urstadt's actions and/or inactions, YogaSpa has suffered damages including substantial damage to its trade fixtures and equipment, was effectively deprived of the use and enjoyment of the Premises for the commercial purpose for which it was leased, and has incurred damages through costs in refunding memberships and repairing equipment and fixtures, in an amount to be determined at trial, but not less than $400,000.00.

### AS AND FOR A TENTH CAUSE OF ACTION
(*Aiding and Abetting Private Nuisance against Elmsford and Urstadt*)

90. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

91. As set forth above, Popeyes committed private nuisance affecting, and occasioning damage to, the Premises.

92. Elmsford and Urstadt were aware of the nuisance, as indicated by the comments made by Mr. Dias to Ms. Vernon.

93. Elmsford and Urstadt knowingly and intentionally provided substantial assistance in furtherance of Popeyes' nuisance by concealing the nuisance from YogaSpa.

94. As a direct and proximate result of Elmsford and Urstadt's actions and/or inactions, YogaSpa has suffered damages inasmuch as it suffered substantial damage to its trade fixtures and equipment, was effectively deprived of the use and enjoyment of the Premises for the commercial purpose for which it was leased, and has incurred damages through costs in refunding memberships and repairing equipment and fixtures, in an amount to be determined at trial, but not less than $400,000.00.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (*Constructive Eviction against Elmsford*)

95. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

96. At all material times herein, YogaSpa has performed all covenants under the Lease which it was obliged to perform.

97. As is detailed above, Elmsford caused, or permitted to be caused, damage to the Premises and YogaSpa's trade fixtures and equipment of such scale as to prevent it from using the Premises for the commercial purpose for which it is leased.

98. Elmsford's wrongful actions effectively deprived YogaSpa of the enjoyment and possession of the Premises.

99. Following the damage to the Premises, YogaSpa notified Elmsford immediately that it was unsafe for use for the commercial purpose for which it had been leased.

100. Elmsford's actions and/or inactions therefore constitute constructive eviction, as a direct and proximate result of which YogaSpa has suffered damages including substantial damage to its trade fixtures and equipment, was effectively deprived of the use and enjoyment of the Premises for the commercial purpose for which it was leased, and has incurred damages through costs in refunding memberships and repairing equipment and fixtures, in an amount to be determined at trial, but not less than $400,000.00.

## AS AND FOR A TWELFTH CAUSE OF ACTION
### (*Breach of Contract against Elmsford*)

101. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

102. It was, at all material times herein, both an express and implied term of the Lease that YogaSpa be entitled to the quiet enjoyment of the Premises.

103. As set forth above, Elmsford caused, or permitted to be caused, damage to the Premises and YogaSpa's trade fixtures and equipment, such as to constitute constructive eviction.

104. Such damage constitutes a breach of the covenant of quiet enjoyment contained in the Lease.

105. As a direct and proximate result of this breach, YogaSpa has suffered damages including substantial damage to its trade fixtures and equipment, was effectively deprived of the use and enjoyment of the Premises for the commercial purpose for which it was leased, and has incurred damages through costs in refunding memberships and repairing equipment and fixtures, in an amount to be determined at trial, but not less than $400,000.00.

**WHEREFORE**, Plaintiff seeks a judgment against Defendants, jointly and severally as follows:

**1)** On its First Cause of Action, for damages in an amount to be determined at trial but not less than $400,000.00;

**2)** On its Second Cause of Action, for damages in an amount to be determined at trial but not less than $400,000.00;

**3)** On its Third Cause of Action, for damages in an amount to be determined at trial but not less than $400,000.00;

**4)** On its Fourth Cause of Action, for damages in an amount to be determined at trial but not less than $400,000.00;

**5)** On its Fifth Cause of Action, for damages in an amount to be determined at trial but not less than $400,000.00;

**6)** On its Sixth Cause of Action, for damages in an amount to be determined at trial but not less than $400,000.00;

**7)** On its Seventh Cause of Action, for damages in an amount to be determined at trial but not less than $400,000.00;

**8)** On its Eighth Cause of Action, for damages in an amount to be determined at trial but not less than $400,000.00;

**9)** On its Ninth Cause of Action, for damages in an amount to be determined at trial but not less than $400,000.00;

**10)** On its Tenth Cause of Action, for damages in an amount to be determined at trial but not less than $400,000.00;

**11)** On its Eleventh Cause of Action, for damages in an amount to be determined at trial but not less than $400,000.00;

**12)** On its Twelfth Cause of Action, for damages in an amount to be determined at trial but not less than $400,000.00; and

- For such other or further relief as this Court may deem just, proper and equitable.

**JURY DEMAND**

Plaintiff hereby demands a trial on the merits by jury pursuant to Fed. R. Civ. P. 38.

Dated: New York, New York
February 2, 2021

                Respectfully Submitted,

                **RICHTER RESTREPO PLLC**

                **BY:**   */s/ Peter M. Rivera*
                          Peter M. Rivera
                          Attorneys for Plaintiff
                          *Bodhi Building, Ltd.,*
                          *d/b/a "YogaSpa"*
                          55 Broadway, Third Floor
                          New York, NY 10006
                          P: (347) 745-0375
                          E: peter@richterrestrepo.com